UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

C.H. Robinson Worldwide, Inc.,

     Plaintiff,

v.

Traffic Tech, Inc., James
Antobenedetto, Spencer Buckley,
Wade Dossey, Brian Peacock, and
Dario Aguiniga,

     Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 19-902 (MJD/DTS)

---

Joel O'Malley, Katie M. Connolly, Nicole F. Dailo and Andrew L. Peterson, Nilan Johnson Lewis, P.A., Counsel for Plaintiff.

Pamela Abbate-Dattilo and Lukas S. Boehning, Fredrikson & Byron, P.A., Counsel for Defendants.

---

This matter is before the Court on Defendants' Motion for Summary Judgment. [Doc. No. 125]

# I.    Background

Plaintiff C.H. Robinson Worldwide, Inc. ("CHR"), a Delaware corporation with its principal place of business in Minnesota, is in the business of providing third-party logistics, acting as a broker between companies that need to ship

1

goods and other companies that provide transportation services.  Defendant

Traffic Tech, Inc. ("Traffic Tech"), a Canadian corporation headquartered in

Chicago, Illinois, is also in the logistics industry acting as a freight broker.  The

individual defendants, all citizens of California, worked for CHR in California.

After leaving CHR's employ, the individual defendants immediately began

working for Traffic Tech in California.

CHR asserts that as a condition of employment with CHR, the individual

defendants executed a Confidentiality and Protection of Business Agreement

("CPB Agreement") that contained customer non-solicit and business interfering

clauses, but that the plain terms of these agreements allowed the individual

defendants to work for Traffic Tech, in the same positions they held as CHR

employees.  With respect to defendants Antobenedetto, Buckley, Dossey and

Aguiniga, who all began their employment prior to 2017, the customer non-

solicit and business interfering clauses provided:

> Therefore, in consideration of the Company's entrusting me with
> Confidential Information and the opportunity to represent the company in
> dealings with Business Partners[1], in consideration of my employment by
> the Company, in consideration of the compensation, benefits and

---

[1] "Business Partner" is defined in the CPB Agreement as "any Customer, Carrier, consultant, supplier, vendor, or any other person, company, organization, or entity that has conducted business with or potentially could conduct business with [CHR] in any of the Company Business."

opportunities available to me through such employment, and in consideration of the other benefits and covenants provided to me by this Agreement.

I hereby agree as follows:
* * *
C.  For a period of two (2) years after the termination of my employment with the Company, however occasioned and for whatever reason, I will not:

1. Directly or indirectly, for the benefit of any Competing Business (including a business which I may own in whole or in part), solicit, engage, sell or render services to, or do business with any Business Partner or prospective Business Partner of the Company with whom I worked or had regular contact, on whose account I worked, or with respect to which I had access to Confidential Information about such Business Partner at any time during the last two years of my employment with the Company; or
* * *

3. Directly or indirectly cause or attempt to cause any Business Partner of the Company with whom the Company has done business or sought to do business within the last two (2) years of my employment to divert, terminate, limit or in any manner modify decrease or fail to enter into any actual or potential business relationship with the Company.

(O'Malley Decl. ¶¶ 2-6; Exs. A-C, and E, Section IV.)

These CPB Agreements also contained the following choice-of-law

provision:

I agree that all of my obligations hereunder shall be binding upon my heirs, beneficiaries, and legal representatives and that the law of the State of Minnesota shall govern as to the interpretation and enforceability of this Agreement without regard to conflicts of law principles.  Employee and

Company agree that any claim or dispute between them shall be adjudicated or arbitrated exclusively in the State of Minnesota, Hennepin County District Court, or the United States District Court for the District of Minnesota.  Employee and Company hereby consent to the personal jurisdiction of these courts and waive any objection that such venue is inconvenient or improper.

(Id. Exs. A-C and E, Section X.)

The non-solicit language used in defendant Peacock's CPB Agreement, who began working for CHR in July 2017, was changed to restrict contact with CHR Business Partners by use of CHR's confidential information.  (Id. Ex. D, Section IV "Use the Company's Confidential Information in order to directly or indirectly, for the benefit of any Competing Business (including a business which I may own in whole or in part), solicit, engage, sell or render services, to or do business with any Business Partner or prospective Business Partner of the Company . . .").)

(Id. Ex. D.)

The choice-of-law provision in Peacock's CPB Agreement is also different:

I agree that all of my obligations hereunder shall be binding upon my heirs, beneficiaries, and legal representatives.  With respect to claims or disputes arising in California, I agree that the law of the State of California shall govern as to the interpretation and enforceability of the Agreement without regard to conflicts of law principles.  With respect to all other claims or disputes, I agree that the law of the State of Minnesota shall govern as to the interpretation and enforceability of this Agreement

without regard to conflicts of law principles.  Employee and Company
agree that any claim or dispute between them arising in California shall be
adjudicated or arbitrated exclusively in the State of California, Superior
Court of California – County of San Diego, or the United States District
Court for the Southern District of California.  Employee and Company
agree that any other claim or dispute between them shall be adjudicated or
arbitrated exclusively in the State of Minnesota, Hennepin County District
Court, or the United State District Court for the District of Minnesota.
Employee and Company hereby consent to the personal jurisdiction of
these courts and waive any objection that such venue is inconvenient or
improper.

(Id. Ex. D, Section X.)

### A.     James Antobenedetto

James Antobenedetto was interviewed for a position and received a job

offer from CHR by email in 2015.  (Doc. No. 127, Abbate-Dattilo Decl., Ex. 50

(Antobenedetto Dep. at 17).)  The offer letter provides that "[a]s a condition of

employment, you will be asked to sign an Employee Sales Agreement at C.H.

Robinson.  A copy of the agreement is available for your review at the following

[link provided][2]."  (Id. Ex. 6.)  Antobenedetto did not click on the link provided.

(Id. Ex. 50 at 18, 119.)

Antobenedetto was assigned to CHR's San Diego office.  (Id. at 117.)

During his first day of work, he was provided a copy of the CPB Agreement,

---

[2] While the offer letters refers to an "Employee Sales Agreement" the link connected to the CPB
Agreement.

along with a number of other documents.  (<u>Id.</u> at 22.)  When asked to sign the

CPB Agreement, CHR did not alert him to the restrictive covenants contained

therein or the Minnesota choice of law provision.  (<u>Id.</u> at 116-17.)  Antobenedetto

claims the restrictive covenants were never discussed during his employment,

and the only time he fully read the document was after this action was filed.  (<u>Id.</u>)

Antobenedetto signed the CPB Agreement on April 28, 2015 in San Diego,

California.  (<u>Id.</u> at 21-22; O'Malley Decl. Ex. A.)

    Antobenedetto was originally hired as an account manager, which

involved the servicing of current CHR customers.  (Abbate-Dattilo Decl., Ex. 50

(Antobenedetto Dep. at 39-41).)  In 2017, he became a sales executive, which

required him to go after new business instead of maintaining current business.

(<u>Id.</u> at 40-41.)

### B.    Spencer Buckley

    Spencer Buckley began working for CHR two months before receiving his

college degree as an account manager.  (<u>Id.</u> Ex. 51 (Buckley Dep. at 11-12).)

Buckley had two in-person interviews, and received a call that he would be

getting an offer letter.  (<u>Id.</u> at 16-17.)  On February 20, 2015, he received an email

from CHR that provided a link to an offer letter.  (<u>Id.</u> at 18; Ex. 12.)  Buckley

assumes he looked at the offer letter, but he is not certain.  (Id. Ex. 51 (Buckley

Dep. at 18).)  Like the offer letter Antobenedetto received, Buckley's offer letter

provided information as to his base salary, and the notification that as a

condition of employment he would have to sign an Employee Sales Agreement,

with a link to that agreement.  (Id. Ex. 7.)

Buckley began work at CHR on March 5, 2015, in the Clairemont,

California location.  (Id. Ex. 51 (Buckley Dep. at 26).)  He was given a copy of the

CPB Agreement as part of all the paperwork for the position.  (Id. at 26, 122.)  He

does not recall if he read the CPB Agreement thoroughly, but he did sign it.  (Id.

at 28-30; Buckley Decl. ¶ 4; O'Malley Decl. Ex. B.)  At no point did anyone at

CHR explain the terms of the CPB Agreement.  (Id. Ex. 51 (Buckley Dep. at 122).)

While employed at CHR, Buckley worked on three different teams, with

four different managers, but always worked out of California.  (Id. at 44, 51-52.)

His contact to Minnesota involved attending a week-long training session in

April or May 2015.  (Id. at 45.)

On July 20, 2018, Buckley was given a written warning for unacceptable

performance and put on a performance improvement plan.  (Id. Exs. 15 and 16.)

He was terminated from CHR on August 2, 2018. (Id. Ex. 51 (Buckley Dep. at 59).)

### C.    Wade Dossey

Wade Dossey also began working at CHR in California right after college. (Id. Ex. 52 (Dossey Dep. at 11).) Following his interview, Dossey received a phone call informing him that he was to receive an offer. (Id. at 14.) He believes he accepted the job over the phone. (Id. at 14, 126-27.) He received an offer letter by email on March 25, 2016. (Id. at 15, Ex. 8.) The letter set forth the job title, compensation and the requirement that he complete an "onboarding program" in either Kansas City, MO or Minneapolis, MN. (Id. Ex. 8.) The letter also provided that as a condition of employment, he would have to sign an Employee Sales Agreement, with a link to that agreement. (Id.) Dossey is certain that he did not click on the link provided. (Id. Ex. 52 (Dossey Dep. at 19, 24).)

While attending the onboard program in Minnesota, two months after he accepted the position, Dossey asserts he first saw and was asked to sign the CPB Agreement. (Id. at 30-31.) Dossey said that he felt rushed to sign it and that he did not review the CPB Agreement before signing it. (Id. at 22, 30-31.) He

further felt he could not negotiate the terms or review it further because he had

already accepted the job and was in Minnesota for training.  (Id. at 26.)

Dossey began as a trainee in the San Diego office.  (Id. at 47.)  His job

duties for the first six months included answering the phone and helping out the

office.  (Id. at 45.)  After his training was completed, Dossey became a sales

executive, managing current accounts and bringing in new business.  (Id. at 47.)

### D.    Brian Peacock

Brian Peacock also joined CHR right after college graduation.  (Id. Ex. 53

(Peacock Dep. at 13).)  He participated in an interview and was notified by email

that he was being offered a position as an associate sales executive in CHR's San

Diego office.  (Id. at 13-14.)  The offer letter, dated April 25, 2017, provided salary

and commission information, and provided that as a condition of employment,

he would have to sign an Employee Sales Agreement, with a link to that

agreement.  (Id., Ex. 9.)  Peacock does not recall that he clicked the link prior to

accepting the job.  (Id. Ex. 53 (Peacock Dep. at 17, 153).)

He began employment with CHR in July 2017 and completed training in

Minnesota.  (Id. at 19-20, O'Malley Decl., Ex. D.)  He testified that while waiting

to check into his hotel, he and other new sales associates were given a number of

documents to sign, one of which was the CPB Agreement.  (Id. Ex. 53 (Peacock

Dep. at 19).)  At that time, he did not read the documents, as he was told to sign

and then go check into the hotel.  (Id. at 20.)  Peacock signed the CPB Agreement

on July 10, 2017, and the restrictive covenants contained therein were not

discussed beforehand.  (Id. at 27.)  After training, he returned to San Diego and

did not return to Minnesota.  (Id. at 62.)

Peacock's duties included phone calls and emails to customers to make

sales.  (Id. at 38.)  Peacock performed near the minimum requirements his first

year, and later resigned in August 2018 and took a few months to travel.  (Id. at

54.)

### E.  Dario Aguiniga

Aguiniga began working for CHR in April 2007.  He was hired as a Sales

Transportation Representative in California.  (Id. Ex. 10.)  Throughout his

employment, Aguiniga signed three different agreements; one in 2007, one in

2013 and one in 2014.  (Id. Exs. 23, 24 and 25.)  CHR is pursuing its claims against

Aguiniga under the 2013 CPB Agreement.  (Sec. Am. Comp. ("SAC") at ¶ 9;

Abbate-Dattilo Decl. Ex. 49 (Vigeant Second Dep. at 46).)  The 2013 CPB

Agreement provides the same language as the CPB Agreements signed by the

other defendants.  (SAC Ex. 25.)  Aguiniga does not remember how this CPB

Agreement was presented to him.  (Abbate-Dattilo Decl., Ex. 54 (Aguiniga Dep.

at 24).)  CHR claims the 2013 CPB Agreement was signed in connection with a

promotion he received in 2014.  (Id. Ex. 26.)

Aguiniga became the supervisor of CHR's San Diego Cross Border Branch.

(Id. Ex. 27.)  In this role, he had a team ranging from four to seven people related

to carrier sales and that Aguiniga handled the personnel matters, such as setting

up goals for the team, P & L's, and tracking his team.  (Id. Ex. 54 (Aguiniga Dep.

at 43-44).)

Because he did not meet the performance expectations of a supervisor,

Aguiniga was put on a performance improvement plan on August 1, 2019.  (Id.

Ex. 28.)  On April 26, 2020, he was informed that he was being furloughed.  (Id.

Ex. 54 (Aguiniga Dep. at 57); Ex. 29.)  After one and one-half months, Aguiniga

started looking for a new position.  (Id. Ex. 54 (Aguiniga Dep. at 59).)

### F. Defendants Join Traffic Tech

Defendants Antobenedetto, Dossey, Buckley and Peacock accepted

employment with Traffic Tech in late 2018.  Antobenedetto, Dossey and Buckley

were working for CHR when they were recruited by Traffic Tech on LinkedIn.

(Id. Ex. 51 (Buckley Dep. at 62); Ex. 50 (Antobenedetto Dep. at 48); Ex. 52 (Dossey Dep. at 51-52).)  Traffic Tech also reached out to Peacock on LinkedIn before and after he left CHR.  (Id. Ex. 53 (Peacock Dep. at 55-56); O'Malley Decl., Ex. G at TT000160_0009-10).)

Aguiniga joined Traffic Tech in 2020 after he was furloughed from CHR. Antobenedetto reached out to Aguiniga to express his sympathies when he learned of Aguiniga's furlough.  (Id. Ex. 35; Ex. 54 (Aguiniga Dep. at 61-62).) Aguiniga informed Antobenedetto that he was looking for work, and Antobenedetto let him know that Traffic Tech was beginning to hire in its La Jolla location.  (Id.)  Aguiniga was interviewed at Traffic Tech and was given an offer of employment.  (Id. Ex. 54 (Aguiniga Dep. at 76).)

### G.   CHR Files Suit

CHR filed this action on February 25, 2019 in Minnesota state court. Defendants removed it to this Court on April 1, 2019.  In the SAC, CHR has alleged three causes of action: Breach of Contract against the individual defendants; Tortious Interference with Contractual Relationship against all Defendants; Tortious Interference with Prospective Economic Advantage against all Defendants.

II.     **Standard for Summary Judgment**

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  <u>Celotex</u>, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  <u>Amini v. City of</u>

<u>Minneapolis</u>, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).  The party opposing summary

judgment may not rest upon mere allegations or denials but must set forth

specific facts showing that there is a genuine issue for trial.  <u>Krenik v. County of</u>

<u>Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995).

III.    **Discussion**

A.      **Breach of Contract Claims Against Individual Defendants**

CHR alleges that the individual defendants each entered into agreements

that contained certain restrictions and obligations and that the individual

defendants breached their respective agreements by soliciting CHR employees to join Traffic Tech and by soliciting CHR customers.

The CPB Agreements signed by the individual defendants, except Brian Peacock, provide that "the law of the State of Minnesota shall govern as to the interpretation and enforceability of this Agreement without regard to conflicts of law principles."  (O'Malley Decl., Exs. A-C and E, Section X.)  Despite this provision, Defendants argue that California law governs all claims against them because they are California residents, work primarily in California, and because California prohibits restrictive covenants in employment agreements.

With few exceptions not applicable here, California law provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."  Cal. Bus. And Prof. Code § 16600.  This provision includes customer non-solicitation agreements.  See Dowell v. Biosense Webster, Inc., 179 Cal. App. 4th 564, 575 (2009).  To prevent employers from using choice of law provisions in employment contracts to avoid California law, California enacted an anti-waiver statute, effective January 1, 2017, that provides:

>An employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would do either of the following:
>>(1) Require the employee to adjudicate outside of California a claim arising in California.
>>(2) Deprive the employee of the substantive protection of California law with respect to a controversy arising in California.

California Labor Code § 925.

With respect to Antobenedetto, Buckley, Dossey and Aguiniga, CHR argues that Minnesota law applies to the claims against them, as the Minnesota choice of law provision in their CPB Agreements are valid, and as a result, Minnesota law governs the interpretation and enforceability of the CPB Agreement.  With respect to Peacock, CHR argues that the claims arise outside of California, therefore Minnesota law governs the claims against Peacock as well.

### 1.    Choice of Law

A federal court sitting in diversity applies the choice of law rules of the forum state.  Highwoods Props., Inc. v. Exec. Risk Indem., Inc., 407 F.3d 917, 920 (8th Cir. 2005).  Minnesota's choice of law principles therefore control.  Under Minnesota law, courts generally honor the parties' contractual choice of law provisions, so long as the parties are acting in good faith and without the intent to evade the law.  Menzies Aviation (USA), Inc. v. Wilcox, 978 F. Supp.2d 983,

996 (D. Minn. 2013) (citing <u>Combined Ins. Co. of Am. v. Bode</u>, 247 Minn. 458, 77

N.W.2d 533, 536 (1956) and <u>Milliken & Co. v. Eagle Packaging Co.</u>, 295 N.W.2d

377, 380, n.1 (Minn. 1980)); <u>Hagstrom v. Am. Circuit Breaker Corp.</u>, 518 N.W.2d

46, 48 (Minn. Ct. App. 1994)).  "However, parties do not have unchecked power

to choose their own law, particularly where the State has 'expressed an intent to

protect its citizens with its own laws by voiding . . . choice of law provisions. . . "

<u>Hedding o/b/o Hedding Sales & Serv. v. Pneu Fast Co.</u>, 18-cv-1233, 2019 WL

79006 at *3 (D. Minn. Jan. 2, 2019) (quoting <u>Banbury v. Omnitrition Intern., Inc.</u>,

533 N.W.2d 876, 880 (Minn. Ct. App. 1995)).  Accordingly, "the law of the state

chosen by the parties will be applied unless to do so 'would be contrary to a

fundamental policy of a state which has a materially greater interest than the

chosen state in the determination of the particular issues. . . '" <u>Id.</u>

To assist in determining whether to enforce a choice of law provision over

an anti-waiver statute, the Eighth Circuit cited with approval a four factor test

used by the Sixth Circuit in <u>Tele-Save Merchandising Co. v. Consumers

Distributing Co.</u>, 814 F.2d 1120 (6th Cir. 1987).  <u>Modern Computer Systems v.

Modern Banking Systems, Inc.</u>, 871 F.2d 734, 738 (8th Cir. 1989) (en banc).  These

factors consider 1) whether the parties agreed in advice to the law to be applied

in future disputes; 2) whether the contacts between the parties were fairly evenly

divided between the state selected in the contract and the state that has enacted

the anti-waiver statute; 3) the parties' relative levels of bargaining power; and 4)

whether application of the law chosen in the contract is repugnant to the public

policy of the state that has enacted the anti-waiver statute.  Id.; see also JRT, Inc.

v. TCBY Systems, Inc., 52 F.3d 734, 739 (8th Cir. 1995) (noting that the Eighth

Circuit adopted Tele-Save in Modern Computer); Banek Inc. v. Yogurt Ventures

U.S.A., 6 F.3d 357, 360 (6th Cir. 1993) (noting the determination of the

applicability of an anti-waiver statute is the first of three separate, sequential

questions).

As to the first factor, there is no dispute that the parties entered into the

CPB Agreement, and that such agreement contained a Minnesota choice of law

provision.

As to the division of contacts between the parties, the Court looks to the

parties' contacts between the two potential forum states.  Modern Computer, 871

F.2d at 739.  Minnesota is CHR's principal place of business and the state named

in the choice of law provisions.  Two of the individual defendants, Dossey and

Peacock, signed their respective CPB Agreements while attending training

sessions in Minnesota, but the circumstances surrounding the execution of those documents demonstrate they were given little time to consider the terms of the agreements, let alone consider the impact of the choice of law provision. The remaining defendants signed their CPB Agreements in California, and California is the state where the individual defendants live and their place of performance under the CPB Agreements. Based on these facts, the Court finds the division of contacts weighs in favor of California.

The parties are also of unequal bargaining power. With the exception of Aguiniga, the individual defendants were entry-level employees when they signed their respective CPB Agreements as a condition of employment. In addition, the CPB Agreements signed by all individual defendants are essentially identical agreements. Aguiniga was asked to sign the CPB Agreement in connection with a job promotion in 2013, but the record demonstrates the agreement Aguiniga signed was the same as the others, and there was no negotiation involved in the signing of said agreement. A contract of adhesion – a take it or leave it form contract between parties of unequal bargaining power - would likely not be enforced under Minnesota law. Menzies Aviation (USA), Inc. v. Wilcox, 978 F. Supp. 2d 983, 997 (D. Minn. 2013) (citing Cell v. Moore &

Schley Sec. Corp., 449 N.W.2d 144, 147 (Minn. 1989).  Accordingly, this factor

weighs in favor of applying California law.

Finally, the Court considers whether California public policy overrides the

choice of law provision.  California law clearly evinces a public policy against

restrictive covenants in employment agreements.  "Section 16600 expresses

California's strong public policy of protecting the right of its citizens to pursue

any lawful employment and enterprise of their choice."  Dowell, 179 Cal. App.

4th at 575.  California Labor Code § 925 was enacted as further protection of

California citizens by eliminating an employer's ability to use a choice of law

provision in order to designate a state with more favorable non-compete laws.

Because Minnesota law also disfavors non-compete agreements, the Court finds

that application of California state law is not repugnant to Minnesota's public

policy concerning such agreements.  See Matson Logistics, LLC v. Smiens, Civil

No. 12-400, 2012 WL 2005607, at *3 (D. Minn. June 5, 2012) (noting that

Minnesota law disfavors non-compete agreements).

Based on the above, the Court finds that application of California's anti-

waiver statute would be appropriate under the facts presented.

## 2.  Whether California Labor Code § 925 Applies to CHR's Claims

Next, the Court must determine whether the California anti-waiver statute

applies to the claims asserted against the individual defendants.

California Labor Code § 925 provides:

(a) An employer shall not require an employee who primarily resides and
works in California, as a condition of employment, to agree to a provision
that would do either of the following:
> (1) Require the employee to adjudicate outside of California a
> claim arising in California.
> (2) Deprive the employee of the substantive protection of
> California law with respect to a controversy arising in California.

(b) Any provision of a contract that violates subdivision (a) is voidable by
the employee, and if a provision is rendered void at the request of the
employee, the matter shall be adjudicated in California and California law
shall govern the dispute.

(c) In addition to injunctive relief and any other remedies available, a court
may award an employee who is enforcing his or her rights under this
section reasonable attorney's fees.

(d) For purposes of this section, adjudication includes litigation and
arbitration.

(e) This section shall not apply to a contract with an employee who is in
fact individually represented by legal counsel in negotiating the terms of
an agreement to designate either the venue or forum in which a
controversy arising from the employment contract may be adjudicated or
the choice of law to be applied.

(f) This section shall apply to a contract entered into, modified, or
extended on or after January 1, 2017.

As the statutory language makes clear, § 925 applies to an employee who

primarily resides and works in California; to controversies that arise in

California; and to a contract entered into, modified or extended on or after

January 1, 2017.

The individual defendants are citizens of California and worked

exclusively in California while employed by CHR.  Further, they are alleged to

have breached the restrictive covenants in their respective CPB Agreements

while working for Traffic Tech in California.  Defendants argue it is thus clear

that CHR's claims for breach of contract and tortious interference against the

individual defendants arise in California.

"A claim arises in any district in which a substantial part of the acts,

events, or omissions occurred that gave rise to the claim."  Decker Coal Co. v.

Commonwealth Edison Co., 805 F.2d 834, 842 (9th Cir. 1986).  For a claim based

on breach of contract, the claim arises in the place of intended performance

rather than the place of repudiation.  Id.

Here, the individual defendants were hired in California and lived and

worked in California during their entire employment with CHR.  Accordingly,

the Court finds that the claims asserted against the individual defendants arose

in California.  Cf. Bromlow v. D & M Carriers LLC, 438 F. Supp.3d 1021, 1030 (N.

D. Cal. 2020) (finding § 925 does not apply when the employee did not live or work in California).

Next, the Court must determine whether the CPB Agreements were entered into or modified after January 1, 2017. As Peacock signed his CPB Agreement on July 10, 2017, there can be no dispute that requirement is met with respect to Peacock. (O'Malley Decl. Ex. D.) As to the other individual defendants, although they signed their respective CPB Agreements before January 1, 2017, Defendants argue such agreements were modified by their Bonus Incentive Agreements that CHR required them to sign after January 1, 2017. The 2018 Bonus Incentive Agreements provided new elements into their employment contracts – salaries and bonuses – that were not part of the original agreements. (SAC, Exs. 10 (Antobenedetto), 14 (Buckley), 18 (Dossey) and 29 (Aguiniga).) Further, the CPB Agreements provide that compensation and benefits were the consideration for the restrictive covenants, but do not provide specific compensation and bonus terms. Instead, those details are included in the Bonus Incentive Agreements. (See Abbate-Dattilo Decl., Ex. 48 (First Vigeant Dep. 62-63).) As a result, Defendants argue the CPB Agreements are modified by the Bonus Incentive Agreements, which introduce the specifics of the employee's

compensation and bonuses.  See Sokol & Associates, Inc. v. Techsonic Industries,

Inc., 495 F.3d 605, 610 (8th Cir. 2007) ("A modification of a contract is a change in

one or more respects, which introduces new elements into the details of the

contract . . . but leaves the general purpose and effect undisturbed.")

In Midwest Motor Supply Co. v. Superior Court of Contra Costa County,

56 Cal. App. 5th 702, 709 (Cal. Ct. App. 2020), the court held that § 925 applies

and a forum selection clause is voidable if it is contained in a contract that is

modified on or after January 1, 2017.  The court found that § 925's applicability

was not limited to a modification of the forum selection clause specifically, but to

a modification of the contract within which the forum selection clause is

included.  Id.  Because the employment agreement was modified after January 1,

2017 to change the employee's compensation, the court held that § 925 allowed

the employee to void the forum selection clause.  Id.

Here, the CPB Agreements were similarly modified when the Bonus

Incentive Agreement added new and different compensation and benefits.  The

CPB Agreements provide:

> As a condition of employment or continued employment, Employee
> agrees to be bound by and act in accordance with this Agreement.  In
> consideration of the mutual obligation incurred and benefits obtained
> hereunder and other good and valuable consideration (including, without

limitation, access to Company's confidential information, customers, carriers, and other business partners, opportunities for learning and experience, opportunities for increased compensation and other benefits, restricted stock opportunities, bonus opportunities and opportunities for advancement) which would not be available to Employee except in return for entering into this Agreement and the sufficiency of such valuable consideration Employee hereby acknowledges . . .

(SAC Exs. 1-4, Section I.)

The Bonus Incentive Agreements were incorporated into the CPB

Agreement and provided, above the signature line,:

I understand and acknowledge that this Agreement and the benefits made available to me under this Agreement is part of the compensation and consideration available to me in return for the dispute resolution provision it contains and also the other various agreements I previously have entered into with Company, which agreements may include but are not limited to, Sales-Employee Agreement, Management-Employee Agreement, Confidentiality and Noncompetition Agreement, and Data Security Agreement. I reaffirm and agree anew to abide by all my prior agreements with Company as a necessary condition of receiving the benefits under this Agreement.

(SAC, Exs. 10, 14, 18 and 29.)

The Court finds that the Bonus Incentive Agreement modified the

individual defendants' compensation, and therefore modified the CPB

Agreement. The Bonus Incentive Agreement is the only agreement that sets

forth the terms of the individual defendants' compensation, and compensation is

specifically identified as consideration for the restrictive covenants set forth in

the CPB Agreements.  Each subsequent year, CHR changed the individual

defendants' compensation through the Bonus Incentive Agreements, which also

required that the individual defendants affirm and agree anew to the terms of

their restrictive covenants in the Agreement.  (See e.g., SAC Ex. 10.)

Because the CPB Agreements were modified after January 1, 2017 when

Antobenedetto, Buckley, Dossey and Aguiniga signed their 2018 Bonus Incentive

Agreements, the Court finds that § 925 applies to the choice of law provisions in

the CPB Agreements, making them voidable.  The individual defendants have

elected to void those provisions, therefore the Court will apply California law to

the CHR's claims[3].

### 3.  Whether Contracts are Enforceable Under California Law

Next, the Court must determine whether the restrictive covenants

contained in the CPB Agreements are enforceable under California law.  As

noted previously, California law provides that "every contract by which anyone

---

[3] The Court further rejects CHR's argument that the individual defendants waived the right to void the CPB Agreements because they waited too long to assert the right.  Waiver requires the "voluntary and intentional relinquishment or abandonment" of a particular right.  Montgomery Ward & Co. v. County of Hennepin, 450 N.W.2d 299, 304 (Minn. 1990).  The record in this case clearly shows the individual defendants did not relinquish or abandon their right to void the CPB Agreements under § 925.  See Doc. Nos. 6, 30, 50, and 118.

is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600.  Non-solicitation clauses, as well as non-compete clauses, have been found to "restrain employees from practicing their chosen profession" and are therefore void under § 16600 *ab initio* and unenforceable.  See e.g. Dowell, 179 Cal. App. 4th at 575.

The non-solicitation clauses in the CPB Agreements provide that for two years after termination of their employment with CHR, the individual defendants would not "directly or indirectly . . . solicit, engage, sell or render services to, or do business with any Business Partner or prospective Business Partner of the Company with whom I worked or had regular contact, on whose account I worked, or with respect to which I had access to Confidential Information . . . "  The definition of "Business Partner" includes more than just CHR customers, it also includes carriers, consultants, contractors, suppliers, vendors or any other person, company, organization or entity that has conducted business with CHR.  Another non-solicitation provision provides that the individual defendants, within two years of terminating their employment with CHR, could not "[d]irectly or indirectly cause or attempt to cause any Business Partner of the Company with whom the Company has done business or sought

26

to do business within the last two (2) years of my employment to divert,

terminate, limit or in any manner modify decrease or fail to enter into any actual

or potential business relationship with the Company."  This provision is not

limited to "Business Partners" the individual defendants had contact with or

about who they had confidential information.

The Court finds that these non-solicitation clauses are very broad.  The

clauses are not limited to the protection of confidential information and together

operate to restrict the individual defendants from contacting any CHR customer,

vendor, partner or carrier.  As such, the non-solicitation clauses unreasonably

restrict the individual defendants' ability to engage in their lawful profession.

Accordingly, the Court finds the non-solicitation clauses are unenforceable under

California law[4].

### 4.  Application of California Law Does Not Violate Due Process

Finally, CHR argues that § 925 violates the Due Process Clause.  "The Due

Process Clause of the Fourteenth Amendment prohibits a State from imposing a

---

[4] The Court further notes that even under Minnesota law, the Court would find the non-solicitation agreements at issue are overbroad, and unenforceable.  See Bennett v. Storz Broadcasting Co., 270 Minn. 525, 134 N.W.2d 892 (1965) (finding that restrictions which are broader than necessary to protect the employer's legitimate interests are generally held invalid).

'grossly excessive' punishment on a tortfeasor." <u>BMW of N. Am., Inc. v. Gore</u>, 517 U.S. 559, 562 (1996) (finding "a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasor's lawful conduct in other States."); <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. 408, 409 (2003) (finding $145 million punitive damages award under Utah law violated Due Process as award was based in part on out-of-state conduct that was lawful where it occurred).

The Commerce Clause "has long been understood to have a 'negative' aspect that denies States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." <u>Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Oregon</u>, 511 U.S. 93, 98 (1994). "[T]he first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it regulates evenhandedly with only incidental effects on interstate commerce, or discriminates against interstate commerce. <u>Id.</u> at 99 (cleaned up). Discriminate "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter" such as higher surcharges for out-of-state waste haulers than for in-state waste haulers. <u>Id.</u> at 99.

The Court finds that § 925 regulates evenhandedly.  If CHR hires employees in California, it is subject to the laws of California just like every other employer that employs individuals in California.  See Yoder v. Western Express, Inc., 181 F. Supp.3d 704 (C.D. Cal. 2015) (finding application of California's wage and hour laws would not violate dormant Commerce Clause); Waguespack v. Medtronic, Inc., 185 F. Supp.3d 916, 927 (M.D. La. 2016) (finding Louisiana law that prohibits forum selection and choice of law clauses in employment contracts, unless the clauses are expressly, knowingly and voluntarily entered into and ratified after the occurrence of injury, did not violate dormant Commerce Clause because any burden on Defendant was incidental and because Louisiana law effectuated a legitimate local interest).

Because Section 925 does not discriminate between out-of-state employers and in-state employer, it must be upheld unless the burden imposed on commerce is clearly excessive in relation to the local benefits.  Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).  This requires the Court to balance California's public interest against any incidental burdens on interstate commerce.  Id.

The only burden identified by CHR is that it interferes with its management of its workforce, yet CHR fails to demonstrate how that interest outweighs California's public interest in the protection of employee rights. Further, § 925 does not interfere with CHR's ability to manage its workforce – it is free to hire employees of its choice, open offices of its choice and make sales and profits in California. The only restriction concerns how post-employment activities are governed for employees that live and work in California, and the Court finds this is not a burden on interstate commerce that outweighs California's strong, legitimate interest in regulating the employment of its citizens. See Application Group, Inc. v. Hunter Group, 61 Cal. App. 4th 881, 900 (Cal. Ct. App. 1998) (finding no reason why California employee's interests should not be deemed paramount to the competitive business interests of out-of-state as well as in-state employers).

### B.    Tortious Interference Claims

Count II asserts that Defendants tortiously interfered with CHR's contractual relationship with its customers, and its employees. Count III asserts that Defendants have tortiously interfered with CHR's long-standing and continuing business relationship with its customers which created a reasonable

expectation that CHR would continue to do business with them for CHR's

economic advantage.

> A claim of tortious interference with contract has the following elements:
>
> (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of
> the contract; (3) intentional procurement of its breach; (4) without
> justification; and (5) damages. The burden of proving sufficient
> justification for interference is upon the defendant.

Furlev Sales and Assocs., Inc. v. N. Am. Automotive Warehouse, Inc., 325

N.W.2d 20, 25 (Minn. 1982).

With respect to the claim that Defendants interfered with CHR's contracts

with customers, CHR corporate representative Blake Nowak was asked during

his 30(b)(6) deposition if CHR has exclusive contracts with any of its customers,

to which he responded in the negative.  (Abbate-Datillo Decl., Ex. 58 (Nowak

Dep. at 147).)  Alondra Alejo, another CHR corporate designee, testified that

carriers are also free to do business with other companies.  (Id., Ex. 57 (Alejo Dep.

at 71).)  In opposition to Defendants' motion for summary judgment, CHR did

not address whether or not it had customer or carrier contracts that were

interfered with by Defendants.  CHR has thus not demonstrated that Defendants

caused any breach of a customer or carrier contract.  See Superior Edge, Inc. v.

<u>Monsanto Co.</u>, 964 F. Supp.2d 1017, 1043 (D. Minn. 2013).  Accordingly,

Defendants are entitled to summary judgment on the claim that they tortiously

interfered with CHR customer or carrier contracts.

As to the claim that Defendants tortiously interfered with the restrictive

covenants within the CPB Agreements at issue, the Court finds those claims fail

as well because those restrictive covenants are unenforceable.  Because the

restrictive covenants are unenforceable and otherwise do not prevent Traffic

Tech from hiring employees from CHR, CHR has failed to demonstrate there are

material fact issues as to whether Defendants acted intentionally or wrongfully

in accepting employment at Traffic Tech and by soliciting CHR customers, or

that Traffic Tech acted intentionally and wrongfully by recruiting CHR

employees.  See <u>Oak Park Dev. Co., Inc. v. Snyder Bros. of Minnesota, Inc.</u>, 499

N.W.2d 500, 506 (Minn. Ct. App. 1993) (interference must be intentional).

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary

Judgment [Doc. No. 125] is **GRANTED**.  This matter is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  September 22, 2021          s/Michael J. Davis
                                   Michael J. Davis
                                   United States District Court