# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

C.H. Robinson Worldwide, Inc.,

          Plaintiff,

v.

Traffic Tech, Inc., James Antobenedetto, Spencer Buckley, Wade Dossey, Brian Peacock, and Dario Aguíñiga,

          Defendants.

No. 19-CV-00902 (KMM/DTS)

**ORDER**

---

    This is a contract and tort dispute brought by Plaintiff C.H. Robinson Worldwide, Inc. ("CHR") against Defendant Traffic Tech, Inc. ("Traffic Tech") and five individual defendants: James Antobenedetto, Spencer Buckley, Wade Dossey, Brian Peacock, and Dario Aguiniga. The Court will refer to Traffic Tech and the individual defendants, collectively, as "Defendants." CHR is a Delaware corporation with its principal place of business in Minnesota and is a third-party logistics provider, connecting companies that need to ship goods with other companies that provide transportation services. Traffic Tech is a Canadian corporation headquartered in Chicago, Illinois, and is also in the logistics industry acting as a freight broker. The five individual defendants originally worked for CHR in California, and all of them eventually moved to work for Traffic Tech. CHR accuses each of the individual defendants of breaching non-solicitation provisions in their employment contracts, while accusing Traffic Tech of tortious interference in contracts

between CHR and its clients and employees. Before the Court are three motions: 1) CHR's motion to voluntarily dismiss its claims against Mr. Peacock (ECF 230); 2) CHR's motion for summary judgment as to the remaining defendants (ECF 234); and 3) Defendants' motion for summary judgment (ECF 242). For the reasons that follow, the Court **DENIES** CHR's motions and **GRANTS** summary judgment for Defendants.

## I.   Background

This matter returns to the Court on remand from the Eighth Circuit. In September 2021, the Honorable Michael J. Davis granted summary judgment in favor of Traffic Tech and the individual defendants in this case. *See C.H. Robinson Worldwide, Inc. v. Traffic Tech, Inc.*, No. 19-cv-902 (MJD/DTS), 2021 WL 4307012 (D. Minn. Sept. 22, 2021)[1]. In his order, Judge Davis first thoroughly outlined the contract language at issue in this litigation and provided a detailed factual discussion of the employment history of each of the individual defendants with CHR, their departures from CHR to work for Traffic Tech, and CHR's initiation of this lawsuit. *See id*. at *1–5. There has not been meaningful change to the record since Judge Davis's 2021 order, so his background section is incorporated herein by reference and will not be restated here.

Judge Davis then conducted a choice-of-law analysis to determine whether the employment contracts at issue were governed by Minnesota law, as CHR maintained, or California law, as Defendants did. *Id*. at *7. According to CHR, each of the individual defendants signed a Confidentiality and Protection of Business Agreement ("CPB

---

[1] This decision is also docketed in this matter at ECF 170.

Agreement") with CHR, which, with the exception of Mr. Peacock[2], contained a choice-of-law provision dictating the application of Minnesota law to any claims arising under the agreement. *Id*. at *2. However, because each of the individual defendants are citizens of California and each worked exclusively in California while employed by CHR, Judge Davis applied a California "anti-waiver" law that, broadly speaking, seeks to prevent the application of other states' laws to employment relationships in California. *See id*. at *8–9 (discussing California Labor Code § 925). Consequently, Judge Davis determined that California law governed each of the CPB Agreements.[3] *Id*. at *9.

Judge Davis then applied California's statutory presumption against non-compete and non-solicitation agreements and found that the "very broad" non-solicitation provisions in each of the CPB Agreements "unreasonably restrict[ed] the individual defendants' ability to engage in their lawful profession," and the Agreements were unenforceable under California law. *Id*. at *10. Judge Davis also found that CHR's tortious interference with contractual relations claims against Traffic Tech failed. As for alleged interference by Traffic Tech in contracts between CHR and its clients, he concluded that CHR had failed to adduce evidence of any "customer or carrier contracts that were interfered with by [Traffic Tech]." *Id*. at *11. Turning to the claimed interference by Traffic

---

[2] As discussed in greater detail below, Mr. Peacock signed a contract containing a different choice-of-law provision, providing that while claims between him and CHR "arising in" California would be governed by California law, all other claims between Mr. Peacock and CHR would be governed by Minnesota law.

[3] Judge Davis also noted that even if Minnesota law applied to the CPB Agreements, he would find them unenforceable due to the same overly broad non-solicitation provisions. *Id*. at *10 n.4 (*citing Bennett v. Storz Broadcasting Co.*, 134 N.W.2d 892 (Minn. 1965).

Tech in contracts between CHR and its employees, Judge Davis concluded that because the CPB Agreements were unenforceable, CHR had failed to adduce evidence that Traffic Tech "acted intentionally and wrongfully by recruiting CHR employees." *Id.* at *12.

CHR appealed Judge Davis's order. The Eighth Circuit held that, under the common choice-of-law provision in each of their CPB Agreements, Minnesota law, rather than California law, governed the contracts of Mr. Antobenedetto, Mr. Buckley, Mr. Dossey, and Mr. Aguiniga. *C.H. Robinson Worldwide, Inc. v. Traffic Tech, Inc.*, 60 F.4th 1144, 1148 (8th Cir.) ("Minnesota is 'committed to the rule' that parties can agree on the law that governs their contract." (quoting *Milliken & Co. v. Eagle Packaging Co.*, 295 N.W.2d 377, 380 n.1 (Minn. 1980))), *cert. denied*, 144 S. Ct. 190 (2023)[4]. As for Mr. Peacock's distinct choice-of-law provision, the Eighth Circuit found that it was for the district court to determine "in the first instance whether C.H. Robinson's claims or disputes against Peacock arose in California under the language in Peacock's employment contract" before it could determine whether California or Minnesota law governed this dispute. *Id.* at 1150. Accordingly, the matter was remanded for the "district court to substantively analyze whether all or part of the former employees' contracts are unenforceable and, if not, whether the claims for breach of contract and tortious interference with a contractual relationship survive summary judgment." *Id.*[5]

_____

[4] This opinion is found at ECF 211.

[5] The Eighth Circuit affirmed Judge Davis's decision to dismiss the tortious interference claim against Traffic Tech based on alleged interference with contracts between CHR and its customers. *See Id.* at 1151.

Both parties now seek summary judgment based on the Eighth Circuit's ruling. In short, Traffic Tech argues that the CPB Agreements are just as unenforceable under Minnesota law as they are under California law. *See* ECF 246 (Defs.' Mem. in Supp. of S.J.) at 2 ("Minnesota law simply requires a more layered analysis, where California law automatically voids restrictive covenant agreements."). Traffic Tech also argues that, under the remand instructions of the Eighth Circuit, Mr. Peacock's CPB Agreement is "indisputably governed by California law, and is void under California law." *See, e.g.*, *id.* at 9. Finally, Traffic Tech suggests that intervening developments in state legislative activity raise important constitutional issues about choice-of-law determinations that were not addressed by either Judge Davis or the Eighth Circuit, and asks this Court to once again conclude that California law governs all of the CPB Agreements at issue. *Id.* at 3. In contrast, rather than dispute whether the claims or disputes against Mr. Peacock arose in California, CHR instead seeks to voluntarily dismiss with prejudice its claims against him, pursuant to Federal Rule of Civil Procedure 41(a)(2). *See generally* ECF 232 (Pl.'s Mem. in Supp. of Mot. to Dismiss). As for the remaining CPB Agreements, CHR argues that each is enforceable under Minnesota law and that it had "proven its breach of contract claims as a matter of law." ECF 250 (Pl.'s Mem. in Supp. of S.J.) at 22.

## II.   Legal Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Dowden v. Cornerstone Nat'l Ins. Co.*, 11 F.4th 866, 872 (8th Cir. 2021). The moving party must demonstrate that the material

facts are undisputed. *Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Id.* at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Irvin v. Richardson*, 20 F.4th 1199, 1204 (8th Cir. 2021).

On cross-motions for summary judgment, the Court assesses the facts under each motion separately. *Progressive Preferred Ins. Co. v. Est. of Stover*, 485 F. Supp. 3d 1043, 1046 (D. Minn. 2020). "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law. *Seaworth v. Messerli*, No. 09-cv-3437 (RHK/LIB), 2010 WL 3613821, at *3 (D. Minn. Sept. 7, 2010) (quoting *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002)), *aff'd*, 414 F. App'x 882 (8th Cir. 2011).

## III.   Discussion

### A.  CHR's Motion to Dismiss

6

On remand, the Eighth Circuit instructed this Court to determine whether Mr. Peacock's CPB Agreement is governed by California law or Minnesota law, in light of its reversal of Judge Davis's choice-of-law analysis as to all of the agreements. Rather than continue to litigate against Mr. Peacock, however, CHR now moves to voluntarily dismiss its claims against him, with prejudice, pursuant to Federal Rule of Civil Procedure 41(a). Rule 41(a)(1) provides that a plaintiff may dismiss "an action" without leave of court if it does so "by filing: (i) a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment; or (ii) a stipulation of dismissal signed by all parties who have appeared." Barring either of those scenarios, "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Rule 41(a)(2). Somewhat unusually, Mr. Peacock opposes CHR's motion. *See generally* ECF 256 (Defs.' Opp. to Mot. to Dismiss). Therefore, this request will fall under Rule 41(a)(2). For the following reasons, CHR's request is denied.

"A motion to dismiss an action under Rule 41(a)(2) falls to the sound discretion of the district court." C*orning Inc. v. Wilson Wolf Mfg. Corp.*, 639 F. Supp. 3d 877, 882 (D. Minn. 2022) (citing *Herring v. City of Whitehall*, 804 F.2d 464, 466 (8th Cir. 1986)). "A court is not required to dismiss a claim upon request." *Id*. Instead, a court is guided by the primary purpose of Rule 41(a)(2), which is to "prevent voluntary dismissals which unfairly affect the other side." *Metro. Fed. Bank of Iowa, F.S.B. v. W.R. Grace & Co.*, 793 F. Supp. 205, 206 (D. Minn. 1992). "The judicial precedents have made it perfectly clear that the grant or denial of a Rule 41(a)(2) dismissal motion, with or without prejudice, is a matter addressed to the trial court's sound discretion," though dismissals sought with prejudice are

usually granted because such dismissals are complete adjudications that bar further litigation. 9 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2364 & n.8 (4th ed., June 2024 Update) (collecting cases). "Denial of a dismissal with prejudice is proper, however, where it would be unfair to defendant to dismiss the case" under the particular circumstances of the case. *Owner-Operator Indep. Drivers Ass'n v. United Van Lines, Inc.*, No. 4:06-CV-219 (JCH), 2007 WL 1223463, at *2 (E.D. Mo. Apr. 24, 2007) (citing *Gilbreth Int'l Corp.* v. *Lionel Lesiure, Inc.*, 587 F. Supp. 605, 614 (E.D. Pa. 1983).

Here, the Court concludes that to allow CHR to dismiss its case against Mr. Peacock, even with prejudice, would give rise to such an unfairness. CHR has doggedly pursued a case against Mr. Peacock since 2019. Before an earlier round of summary judgment with Judge Davis, CHR had the same opportunity to reflect upon the merits of its case against Mr. Peacock and seek this same dismissal. It did not do so. Instead, CHR argued to Judge Davis that Mr. Peacock's contract (just like those of the other individual defendants) was governed by Minnesota law and that factual disputes precluded summary judgment in Defendants' favor. And after receiving a decision from Judge Davis that it disagreed with, CHR chose to prosecute its case against Mr. Peacock to the Eighth Circuit. Having received the very remand it sought, CHR only now seeks to remove Mr. Peacock from the case.

This request is understandably jarring to Mr. Peacock. Indeed, nothing has developed factually about the case against him since Judge Davis was first asked to award summary judgment to Defendants. Presumably, CHR expects this Court to follow the Eighth Circuit's specific remand instructions as to Mr. Peacock and conclude that the events giving rise to its enforcement action against him occurred in California. It is very

clear that they did, as discussed below. But this reality has been plain from the outset of this litigation. The Court declines to speculate why CHR previously believed that the unique language in Mr. Peacock's CPB Agreement could support the application of Minnesota law in this dispute. But it appears that CHR has now seen the writing on the wall. The inescapable conclusion is that CHR has pursued its case against Mr. Peacock for as long as possible, right up to the moment he receives a judgment in his favor. The Court is not inclined to reward this kind of brinksmanship with an eleventh hour voluntary dismissal. *See Bioxy, Inc. v. Birko Corp.*, 935 F. Supp. 737, 740 (E.D.N.C. 1996) ("[A] motion for voluntary dismissal with prejudice should be granted absent evidence of collusion, *an imminent decision on the merits*, or other extraordinary circumstances.") (emphasis added). And while CHR characterizes a voluntary dismissal with prejudice as being legally indistinguishable to a judgment on the merits, it is worth remembering that this lawsuit involves actual human beings, named in the caption of a federal lawsuit for half of a decade. To a lay party like Mr. Peacock, there is certainly a qualitative difference between receiving a last-second surrender by the plaintiff who has been suing him for years and receiving this Court's neutral assessment that he did nothing wrong.

And to be clear, CHR does not even concede in its briefing that it has no case against Mr. Peacock. Instead, CHR makes very plain that the decision to withdraw its case against him is purely strategic. Both parties expend considerable word count discussing the vagaries of California law and whether recently enacted statutory penalties may or may not attach to CHR if its motion to dismiss is denied. By CHR's own words, Mr. Peacock's opposition to the motion to dismiss is

9

forcing C.H. Robinson to enforce its Agreement against Peacock, and Peacock has threatened to bring new claims based on Section 16600.5, which he can do only if this litigation continues. But Peacock cannot force C.H. Robinson to potentially violate the new law. Indeed, <u>this is the classic example of a plaintiff whose claim was meritorious at the onset of litigation, but who encountered a shift in litigation posture resulting from the enactment of a new law.</u>

ECF 232 at 1 (emphasis added). The law referenced above, codified in early 2024 at California Business and Professions Code § 16600.5, allows for an "employee, former employee, or prospective employee [to] bring a private action . . . for injunctive relief or the recovery of actual damages, or both" for any attempt by an employer to enforce a non-compete agreement. *Id.* § 16600.5(e)(1). But if this new law[6] creates any "shift in litigation posture" at all, that shift does not impact the *merits* of CHR's theory of liability against Mr. Peacock, which has been based on the same evidence and law since Judge Davis first granted summary judgment in 2021. The fact that CHR may now face liability for suing Mr. Peacock under his CPB Agreement changes only the *tactical* landscape of the decision to litigate against him, and speculation[7] about whether Mr. Peacock is somehow "forcing"

---

[6] To be sure, California law has long provided that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. And Prof. Code § 16600(a). This prohibition substantially predates CHR's decision to have its California-based employees sign non-solicit agreements and its decision to litigate against Mr. Peacock. *See, e.g.*, *Edwards v. Arthur Andersen LLP*, 189 P.3d 285 (Cal. 2008) (discussing the history of § 16600, which dates back to 19th century). In other words, CHR has always known that the application of California law to Mr. Peacock's CPB Agreement would likely be fatal to the merits of its case against him.

[7] Indeed, this Court's summary judgment decision ends the litigation against Mr. Peacock as effectively as granting the motion to dismiss would. Given CHR's attempt to voluntarily dismiss, although denied by this Court, nothing would prevent CHR from arguing that it did not seek to enforce Mr. Peacock's CPB Agreement against him following the enactment of Cal. Bus. and Prof. Code § 16600.5.

CHR into this potential liability is a red herring[8] that distracts from this Court's Rule 41(a)(2) analysis.

Ultimately, then, the Court denies CHR's motion to voluntarily dismiss with prejudice at this very late hour. This is for the prosaic, yet still-vital reason that it would be unfair to deny Mr. Peacock his proverbial day in court. *See United Van Lines, Inc.*, 2007 WL 1223463, at *2 (denying motion to voluntarily dismiss with prejudice, in part, because "[d]efendant has put considerable effort and expense into defending against this lawsuit"). Here, the table is set for summary judgment, by plaintiff's own meticulous arrangement. Indeed, all of the parties[9] are entitled to new answers to the questions originally posed to Judge Davis more than three years ago in light of the Eighth Circuit's remand.

---

[8] So, too, are discussions about the potential implications on attorney-fee shifting under California Civil Code § 1717. *See, e.g.*, ECF 263 (Pl.'s Reply in Supp. of Mot. to Dismiss) at 22–25. This Court's Rule 41(a) analysis is guided by the fundamental question of fairness to the defendant, not by whether or not dismissal has potential downstream ramifications for plaintiff.

[9] The Court also notes that because CHR seeks only to dismiss a claim against one of six defendants and because CHR gives no indication that it also intends to withdraw claims against Traffic Tech for allegedly interfering in its contractual relationship with Mr. Peacock, it is unclear if CHR is truly seeking dismissal of "an action" under Rule 41(a) motion, or whether the request more closely resembles a Rule 15 motion to amend the pleadings. *See, e.g.*, *Graco, Inc. v. Techtronic Indus. N. Am., Inc.*, No. 09-cv-1757 (JRT/RLE), 2010 WL 915213, at *2 (D. Minn. Mar. 9, 2010) (discussing this distinction and the nature of "an action" under Rule 41(a)). While the Eighth Circuit has observed that the "differences were more technical than substantial" between a plaintiff's motion for Rule 41(a) dismissal or Rule 15 amendment, *Wilson v. Crouse–Hinds Co.*, 556 F.2d 870, 873 (8th Cir. 1977), that does not mean that there is no difference at all. If this effort to remove Mr. Peacock from the case was more appropriately brought under Rule 15, then that request would also be subject to the Court's discretion and would be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). But regardless of which rule applies, the equities in this circumstance favor reaching a final decision regarding Mr. Peacock.

### B. Cross Motions for Summary Judgment

#### 1. Peacock

As discussed above, the Eighth Circuit instructed this Court to determine "in the first instance whether [CHR]'s claims or disputes against [Mr.] Peacock arose in California." *C.H. Robinson Worldwide*, 60 F.4th at 1150. The Court has reviewed the parties' arguments[10] and the summary judgment record and concludes that there is no dispute, genuine or otherwise, that they did.

According to the operative complaint, Mr. Peacock's CPB Agreement "contains post-employment restrictive covenants prohibiting Peacock for two years after the termination of employment from soliciting C.H. Robinson employees or customers." ECF 115 (Second Am. Compl.) ¶ 82. And CHR alleges that after becoming employed by Traffic Tech, "[Mr.] Peacock used the best point of contact for customers and customers' needs and preferences, based on prior relationships developed at C.H. Robinson, to solicit multiple C.H. Robinson customers" in breach of his agreement. *Id*. ¶ 125(d). The only allegation relevant to a choice-of-law analysis is the legal conclusion that "[Mr.] Peacock's Confidentiality and Protection of Business Agreement provides that the law of the State of Minnesota shall govern the Agreement." *Id*. ¶ 86. The Eighth Circuit has explained,

---

[10] Because CHR moved the Court to voluntarily dismiss its case against Mr. Peacock, it did not offer any argument on summary judgment directed toward whether its claims and disputes against Mr. Peacock arose in the state of California or elsewhere. As such, the Court considers Mr. Peacock's factual and legal assertions in support of summary judgment to be essentially undisputed across the board. However, in the interests of thoroughness, the Court has reviewed the record and legal citations in Defendants' brief and finds that they are more than sufficient to support that Mr. Peacock is entitled to summary judgment.

however, that this is only true if the disputes and claims against him arose outside of California. *C.H. Robinson Worldwide*, 60 F.4th at 1150 ("[Mr. Peacock's] contract first asks whether the 'claims or disputes arise in California.' If the answer is yes, California law applies. If the answer is no, Minnesota law applies.") (cleaned up).

Even when viewing the evidence in the light most favorable to CHR, nothing supports the conclusion that this dispute against Mr. Peacock arose anywhere but California. Simply put, it is undisputed that Mr. Peacock's employment with CHR was entirely based in California and his departure from CHR to work for Traffic Tech also occurred in California. Therefore, all of the evidence in this case suggests that any subsequent behavior by Mr. Peacock while working for Traffic Tech necessarily occurred in California, by a California-based employee of a company at one of its offices in California. CHR offers no reason to conclude otherwise. Thus, as Defendants correctly note, "the performance (or alleged non-performance) of the non-compete agreement took place entirely within California, and California law should be applied." ECF 246 at 34–35 (citing *State Auto Prop. & Cas. Ins. Co. v. Boardwalk Apartments, L.C.*, 572 F.3d 511, 518 (8th Cir. 2009) ("Matters regarding the performance of a contract are governed by the law of the place of performance.")). Mr. Peacock's CPB Agreement is therefore governed by California law.

Under California law "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. &

Prof. Code § 16600(a). As Judge Davis previously noted[11], "[n]on-solicitation clauses, as well as non-compete clauses, have been found to 'restrain employees from practicing their chosen profession' and are therefore void under § 16600 *ab initio* and unenforceable." *C.H. Robinson Worldwide, Inc.*, 2021 WL 4307012, at *10 (quoting *Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 564, 575 (2009)). Here, the non-solicitation agreements in Mr. Peacock's contract clearly restrain Mr. Peacock's professional activities.

Judge Davis previously summarized what these provisions say and purport to do, which the Court now repeats verbatim:

> The non-solicitation clauses in the CPB Agreements provide that for two years after termination of their employment with CHR, the individual defendants would not "directly or indirectly ... solicit, engage, sell or render services to, or do business with any Business Partner or prospective Business Partner of the Company with whom I worked or had regular contact, on whose account I worked, or with respect to which I had access to Confidential Information ..." The definition of "Business Partner" includes more than just CHR customers, it also includes carriers, consultants, contractors, suppliers, vendors or any other person, company, organization or entity that has conducted business with CHR. Another non-solicitation provision provides that the individual defendants, within two years of terminating their employment with CHR, could not "[d]irectly or indirectly cause or attempt to cause any Business Partner of the Company with whom the Company has done business or sought to do business within the last two (2) years of my employment to divert, terminate, limit or in any manner modify decrease or fail to enter into any actual or potential business relationship with the Company." This provision is not limited to "Business Partners" the individual defendants had contact with or about who they had confidential information.

---

[11] To be sure, nothing about the Eighth Circuit's conclusion that Minnesota law governed four of the five CPB Agreements cast doubt upon Judge Davis's legal conclusions about the enforceability of non-solicitation agreements under California law. Those conclusions are incorporated by reference.

14

*Id*. at *10. To be sure, California law does not differentiate between narrow and broad non-compete or non-solicitation agreements: all are void. *See Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 955 (2008) ("Noncompetition agreements are invalid under section 16600 in California, even if narrowly drawn. . . ."); *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1158 (2020) ("[W]e [have] rejected the argument that section 16600 only voids restraints that entirely prohibit an employee from engaging in a profession and not less restrictive limitations that are reasonable.") (*citing Edwards*, 44 Cal. 4th at 946–47). Nevertheless, it is worth noting that the restrictions on Mr. Peacock are very broad. Under the relevant restrictive covenants in his CPB Agreement, Mr. Peacock, an entry-level sales associate who worked for CHR directly out of college, was effectively prohibited from contacting any CHR customer, vendor, partner, carrier, or any entity that conducted business with CHR, in the course of any subsequent employment for two years after leaving CHR. This imposed an obvious limitation on Mr. Peacock's ability to effectively work in his new position with Traffic Tech, as well as likely in the logistics industry as a whole, and the provisions are therefore void under California law.

In once more granting summary judgment in Mr. Peacock's favor, the Court nonetheless declines Defendants' request to "reinstate[]" his attorney fee award. *See* ECF 246 at 35. That award was nullified by the Eighth Circuit, and this Court arrives at its conclusion on summary judgment based on a different legal analysis, guided by the Eighth Circuit's remand instructions.

To the extent that Mr. Peacock believes he is still entitled to fees, he must move this Court and offer legal argument in support of his motion, in accordance with any applicable

15

Federal and Local Rules. Also, the original fee award was directed toward all individual defendants because Judge Davis analyzed all of the agreements together under California law. Therefore, any new petition that relies on California law would need to focus on Mr. Peacock's fees alone. And obviously, any such motion will be properly subject to CHR's opposition, including for the reasons laid out in its motion to dismiss. *See* ECF 263 at 22–25.

### 2.   Antobenedetto, Buckley, Dossey, and Aguiniga

The remaining individual defendants in this matter are also accused of breaching restrictive covenants in their CPB Agreements. As discussed above, Judge Davis previously determined that all the CPB Agreements in this case were governed by California law and granted summary judgment to the individual defendants in this matter because the contracts were unenforceable under California law. The Eighth Circuit reversed this decision, concluding that the CPB Agreements were governed by Minnesota law. Both sides now move for summary judgment once more.

Defendants seek summary judgement on several theories. These include that the agreements lack consideration required for the enforcement of restrictive covenants (*see* ECF 246 at 10–19), that the restrictive provisions are unenforceable due to overbreadth and vagueness (*see id*. at 20–29), as well as a renewed argument in favor of the application

of California law despite the Eighth Circuit's ruling[12] (*id.* at 30–34). CHR now makes its own affirmative summary judgment motion, having declined to do so previously to Judge Davis[13], arguing that the evidence establishes that the CPB Agreements are valid and enforceable and breached. Here, the Court agrees with the Defendants that the restrictive provisions are unenforceable under Minnesota law and grants their motion on that basis. This conclusion requires denial of CHR's own summary judgment motion, and the Court declines to address Defendants' remaining independent arguments in favor of summary judgment.

"Restrictive covenants are enforceable in Minnesota only if they are reasonable." *United Healthcare Servs., Inc. v. Louro*, No. 20-cv-2696 (JRT/ECW), 2021 WL 533680, at

---

[12] Defendants argue that the exercise of Minnesota law over the CPB Agreements remains unconstitutional. In support of this, Defendants raise numerous factual arguments that, quite frankly, were available to them during the appeal of Judge Davis's order. These include the lack of any substantive connection between the defendants and this dispute to the state of Minnesota, that other aspects of the employment relationship between CHR and the individual defendants were governed by California law, and that California legislation bans choice-of-law provisions that attempt to govern California employment arrangements under the laws of other states. *See, e.g.*, ECF 246 at 32 (summarizing arguments). However, Defendants raise one argument that they did not, and could not raise earlier. In 2023, Minnesota enacted legislation that, like that of California, voids covenants not to compete in most employment circumstances. Minn. Stat. § 181.988, subd. 2. The statute further includes an anti-waiver provision, also like that of California, banning the use of choice-of-law provisions to apply the law of another state to a Minnesota employment relationship. *Id.*, subd. 3.

The Court will not second guess the Eighth Circuit's decision in light of this development. The Eighth Circuit knew of California's anti-waiver statute when it nevertheless determined that Minnesota law should govern these agreements. It is not clear how Minnesota's adoption of reciprocal legislation would change this outcome.

[13] Not only did CFR not seek summary judgment the first time around, but it repeatedly argued that factual disputes made such a ruling impossible.

*3 (D. Minn. Feb. 12, 2021). "Minnesota law disfavors noncompete agreements," but the courts will enforce them under certain circumstances. *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 454 (Minn. Ct. App. 2001). "Conversely, California statutes contain prohibitions against restraining a party from engaging in a profession or business unless necessary to protect trade secrets." *Id.* The difference between Minnesota and California law as to the enforceability of noncompete agreements is therefore one of degree. To determine whether a noncompete is enforceable in Minnesota,

> [t]he test applied is whether or not the restraint is necessary for the protection of the business or good will of the employer, and if so, whether the stipulation has imposed upon the employee any greater restraint than is reasonably necessary to protect the employer's business, regard being had to the nature and character of the employment, the time for which the restriction is imposed, and the territorial extent of the locality to which the prohibition extends.

*Bennett v. Storz Broadcasting Co.*, 134 N.W.2d 892, 899 (Minn. 1965); *see also Louro*, 2021 WL 533680, at *3 (discerning factors for consideration that include "(1) whether or not the restraint is necessary for the protection of the business or goodwill of the employer; (2) whether the restraint is greater than reasonably necessary to protect the employer's business; (3) the duration of the restriction; and (4) the territorial scope of the restriction") (citing *Prow v. Medtronic, Inc.*, 770 F.2d 117, 120 (8th Cir. 1985).

The provisions at issue in the CPB Agreements are facially non-solicit agreements, rather than non-compete agreements. However, in terms of enforceability, Minnesota courts treat non-solicit agreements as restrictive covenants, akin to non-compete

agreements.[14] *See*, *e.g.*, *Webb Pub. Co. v. Fosshage*, 426 N.W.2d 445, 450 (Minn. Ct. App. 1988) (analyzing the enforceability of a customer non-solicit agreement, under *Bennett*, as a "restrictive covenant[] [that is] enforced only to the extent reasonably necessary to protect a legitimate business interest"); *Dunn v. Assocs. in Psychiatry & Psych., P.A.*, No. 22-CV-615 (NEB/DJF), 2022 WL 22694603, at *5 (D. Minn. Nov. 10, 2022) (analyzing the enforceability of a non-solicitation and a non-compete provision under the same framework).

The CPB Agreements in this case include two restrictive covenants:

IV. Protection of Business

. . . .

> C. For a period of two (2) years after the termination of my employment with the Company, however occasioned and for whatever reason, I will not:
>
>> 1. Directly or indirectly, for the benefit of any Competing Business (including a business which I may own in whole or in part), solicit, engage, sell or render services to, or do business with any Business Partner or prospective Business Partner of the Company with whom I worked or had regular contact, on whose account I worked, or with respect to which I had access to Confidential Information about such Business

---

[14] The same cannot be said for the Minnesota legislature. Minnesota's 2023 ban on most kinds of non-compete agreements expressly provides that "[a] covenant not to compete does not include a nonsolicitation agreement, or agreement restricting the ability to use client or contact lists, or solicit customers of the employer." Minn. Stat. § 181.988, subd. 1(a). This provision likely raises issues requiring novel judicial interpretation. And as explained below, the Court considers the non-solicit provisions in this case to be akin to non-compete agreements, in their effect. But the Court need not determine whether provisions in this case fall within this new legislative proscription because the statute is not retroactive. *See, e.g.*, *Am. Acad. of Traditional Chinese Med., Inc. v. Yuan*, No. A24-0003, 2024 WL 3755921, at *1 n.1 (Minn. Ct. App. Aug. 12, 2024) (citing 2023 Minn. Laws ch. 53, art. 6, § 1, at 49–50).

> Partner at any time during the last two years of my employment with the Company; or
>
> . . . .
>
> 3. Directly or indirectly cause or attempt to cause any Business Partner of the Company with whom the Company has done business or sought to do business within the last two (2) years of my employment to divert, terminate, limit or in any manner modify decrease or fail to enter into any actual or potential business relationship with the Company.

*See, e.g.*, ECF 131 (Ex. 5 to Abbate Decl.) at 5. The term Business Partner in these provisions is defined as "any Customer, Carrier, consultant, supplier, vendor, or any other person, company, organization, or entity that has conducted business with or potentially could conduct business with [CHR] in any of the Company Business." *Id*. at 3. And from this definition, the term "Customer" is itself defined as "any person, company, or organization that has engaged or potentially could engage the Company's services in any of the Company Business," *id*. at 4, while "Carrier" is defined as "any person, company, or organization that the Company has engaged or potentially could engage for transportation services in any of the Company Businesses," *id*. at 3. In short, these provisions create an enormous web of people and entities that are completely off limits for nearly any kind of commercial engagement for two years of future employment.

The Court first notes that, under *Bennett*, the "stipulation [] imposed upon the employee" in terms of off-limits activities is onerous. 134 N.W.2d at 899. These provisions clearly embrace conduct that goes far beyond active soliciting, and purports to proscribe outcomes as much as it does behavior: Provision IV(C)(1) extends a prohibition to a number of other forms of "direct[] or indirect[]" contact with Business Partners (*i.e.*, no

"engag[ing], sell[ing], [] render[ing] services to, or do[ing] business with" them), while Provision IV(C)(3) bans engagement that has, or might have, certain passive *effects* on CHR (*i.e.*, no "caus[ing] or attempt[ing] to cause" a Business Partner to "divert, terminate, limit or in any manner modify decrease or fail to enter into any actual or potential business relationship with" CHR).

Second, the list of parties with whom the defendants cannot do any of these things is vast. Indeed, the list's "territorial extent," *Bennett*, 34 N.W.2d at 899, is unlimited. The contract's definition of a Business Partner ("any [] person, company, organization, or entity that has conducted business with or potentially could conduct business with [CHR] in any of the Company Business") includes two additional sub-defined terms of "Customer" and "Carrier." As Judge Davis noted previously, the interaction of these definitions with the language of the two numbered provisions includes far more than CHR customers and unequivocally includes entities with whom the individual defendants had no kind of relationship stemming from their employment at CHR. *See C.H. Robinson Worldwide, Inc.*, 2021 WL 4307012, at *10. ("The definition of "Business Partner" includes more than just CHR customers, it also includes carriers, consultants, contractors, suppliers, vendors or any other person, company, organization or entity that has conducted business with CHR."). And it also includes "potential" customers, carriers, and Business Partners, broadening its reach enormously.

Simply put, to fully comply with these restrictions, the Individual Defendants would be practically unable to provide anything of value to any other employer in the entire logistics industry for two years after leaving CHR. This goes well beyond what is necessary

to protect CHR's "business and goodwill," as contemplated by *Bennett*. This restriction is

facially unreasonable and renders the provisions unenforceable. Specifically, elements of

the provisions in the CPB Agreements apply to *all* CHR Business Partners, whether or not

the individual defendants had any kind of business relationship with them while working

for CHR. While the Court cannot locate directly on-point authority in Minnesota

addressing the enforceability of non-solicit agreements that include a company's customers

with whom an employee had no dealings, a great number of states that apply frameworks

similar to *Bennett* find such provisions to be unenforceable. *See, e.g., Progressive Techs.,*

*Inc. v. Chaffin Holdings, Inc.*, 33 F.4th 481, 486 (8th Cir. 2022) (under Arkansas law, "the

customer-solicitation restriction here unreasonably goes beyond [a] valid interest by

prohibiting [the defendant] from contacting prospective customers with whom he had no

contact"); *MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234, 1241 (11th Cir. 2005) (under

Georgia law, "to be enforceable, a customer non-solicitation covenant must either have a

specific territory contiguous with the area serviced by the employee, or be limited to only

those customers with whom the employee had a business relationship during some period

of the employment"); *Gene Codes Corp. v. Thomson*, 99 U.S.P.Q.2d 1448 (E.D. Mich.

2011) (under Michigan law, a non-solicit agreement was "enforceable only as to customers

that Defendant herself successfully solicited on behalf of Plaintiff or with whom Defendant

had built up goodwill while working for Plaintiff"); *Padco Advisors, Inc. v. Omdahl*, 179

F. Supp. 2d 600 (D. Md. 2002) (under Maryland law, concluding that a covenant was

unreasonable where it forbid a former employee from contacting any customer in the

employer's database for two years, even if the employee was not aware that they were in

the database). Furthermore, this overbreadth is exacerbated by the fact that the definitions seem to broaden the restrictions of the provisions to include *any potential* CHR Business Partner (*i.e.*, "customers" and carriers" being all of those that CHR "potentially could engage" with). This extra layer requires a level of prescience (or more likely guesswork) that is a clear indicator of the overbreadth of these provisions. *See, e.g.*, *Gavaras v. Greenspring Media, LLC*, 994 F. Supp. 2d 1006, 1012 (D. Minn. 2014) (noncompete agreement was unenforceable, in part, because it "leaves the employee guessing about what companies … come in conflict with the Noncompete Agreement.").

More fundamentally, the Court agrees with Defendants that, if given full credence, these non-solicit provisions become a *de facto* non-compete agreement, massive in scope and without any geographic limit due to CHR's nationwide reach. This would effectively render anyone subject to those provisions unemployable in the industry for two years[15] after leaving CHR. Restrictive covenants that effectively create unbounded, industry-wide bans on working for an employer's competitors have been repeatedly declared unenforceable. *See Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1049 (D. Minn. 2019) (finding unenforceable an agreement that made the defendant unemployable in numerous roles to a "vast array of employers" in his industry); *Marvin*

---

[15] The Court assumes without deciding that a two-year non-solicit agreement, taken in isolation, would not render the provisions unenforceable under Minnesota law. *See, e.g.*, *Dean Van Horn Consulting Assoc. v. Wold*, 367 N.W.2d 556, 560 (Minn. Ct. App. 1985) (three-year restriction reasonable); *Alside, Inc. v. Larson*, 220 N.W.2d 274 (Minn. 1974) (two-year restriction reasonable). However, the two-year period presented here does not exist in isolation. Because the provisions at issue essentially render these defendants unemployable for two years, the prevailing case law dealing with the discrete question of how long an employer may restrict the solicitation of former clients is of limited usefulness.

23

*Lumber & Cedar Co. v. Severson*, No. 15-cv-1869 (MJD/LIB), 2015 WL 5719502, at *8 (D. Minn. Sept. 28, 2015) (restrictive covenant that "effectively prohibits Defendant from engaging in any business remotely related to or associated with Plaintiff's industry" was unenforceably broad); *J.V. & Sons Trucking, Inc. v. Asset Vision Logistics, LLC*, No. 20-cv-02538 (KMM/BRT), 2022 WL 4273533, at *8 (D. Minn. Sept. 15, 2022) (observing under Texas law that a non-disclosure provision was so broad as to effectively become an unlimited non-compete agreement that restricted a party's ability to do business in an entire sector of the trucking industry, and finding that provision unenforceable); *Eutectic Welding Alloys Corp. v. West*, 160 N.W.2d 566, 571 (Minn. 1968) ("Restrictive covenants that serve primarily to prevent an employee from working for others . . . in the same competitive field so as to discourage him from terminating his employment constitute a form of industrial peonage without redeeming virtue in the American enterprise system.").

CHR makes numerous arguments to preserve the enforceability of the CPB Agreements against Mr. Antobenedetto, Mr. Buckley, Mr. Dossey, and Mr. Aguiniga. Two are of relevance to this Court's order. First, CHR argues that under Minnesota law, a covenant cannot be "facially" unenforceable because the "reasonableness of a restrictive covenant cannot be facially determined from hypotheticals." ECF 255 at 19. Second, CHR suggests that the Court should "blue pencil" the contracts at issue to remove any aspects that are unenforceable under Minnesota law. *Id*. at 24–25. Neither argument is persuasive enough to change the Court's conclusion.

As to the first argument, the Court disagrees that Minnesota law does not allow for a "facial" assessment that a restrictive covenant is unenforceable. Courts routinely make

purely legal determinations about whether restrictive covenants are unenforceable on their face. *See, e.g.*, *Gavaras*, 994 F. Supp. at 1012 (awarding "a declaratory judgment finding the Noncompete Agreement *facially unenforceable*" under *Bennet*) (emphasis added); *Dunn*, 2022 WL 22694603, at *5 (granting a motion to dismiss because a non-solicitation agreement was facially overbroad under Minnesota law for lack of any geographic limitation). Indeed, this focus on the legal effect of the language of the contract itself is rooted in *Bennet*, which inquires whether a "stipulation" imposes a restriction that is greater than necessary, not whether an employer's manner of enforcement is. 134 N.W.2d at 899. CHR counters with *Amano McGann, Inc. v. Klavon*, in which the Minnesota Court of Appeals overturned a district court's dismissal of claims of breach of a non-compete agreement on a Rule 12(b)(6) motion, predicated on the conclusion that the restrictive covenant at issue was facially unenforceable. No. A21-0237, 2021 WL 5442339 (Minn. Ct. App. Nov. 22, 2021). The court instructed that instead, the district court "must focus not just on the language of the agreement, but also the attendant circumstances" of the individuals alleged to be in breach of their restrictive covenants and the conduct underlying that alleged breach. *Id.* at *3. In other words, CHR urges that this Court must look to the context of its enforcement efforts to determine whether the provisions are unenforceably overbroad. It is noteworthy that the *Amano McGann* case was at the motion to dismiss stage, while here we have a fully developed record. But the "attendant circumstances" found in that record do not improve CHR's position. Rather, they reveal an employer willing to aggressively enforce its covenants at their outer boundaries.

25

First, the Court considers the targets of this litigation. As Judge Davis previously observed, "[w]ith the exception of Aguiniga, the individual defendants were entry-level employees when they signed their respective CPB Agreements as a condition of employment." *C.H. Robinson Worldwide, Inc.*, 2021 WL 4307012, at *7. None were very highly paid. Mr. Antobenedetto and Mr. Buckley joined at base salaries of $40,000 in 2015; Mr. Dossey and Mr. Peacock at $44,000 in 2016 and 2017, respectively; and Mr. Aguiniga at $37,000 in 2007.[16] *See* ECF 131 (Exs. 6–10 to Abbate Decl.). The record raises no dispute of the fact that these defendants were not highly valued team members at CHR, let alone that they were not essential in their employment there. Indeed, Mr. Aguiniga was described in 2018 as "not meeting expectations. His underperformance has had a negative impact on developing himself and [his] direct reports …." ECF 138 (Ex. 28 to Abbate Decl.) at 26. He was later furloughed during the COVID pandemic, and then quit. *Id*. (Ex. 29 to Abbatte Decl.). Mr. Buckley was, in fact, fired, apparently for tardiness, and also possibly for failing to participate in performance evaluation procedures. ECF 145 (Ex. 51 to Abbate Decl.). Mr. Peacock was deemed in 2018 to be "a minimum player" and likened to a student with potential who is nonetheless "shooting for a 'C.'" ECF 130 (Ex. 3 to Abbate Decl.). There is no evidence in the record to suggest that any of individual defendants received meaningful and/or proprietary training at CHR or that CHR otherwise made substantial investments in any of them. In short, everything in the record suggests that the five individual defendants were, until being sued by CHR, otherwise unnoteworthy

---

[16] Mr. Aguiniga's base salary in 2018 appears to have risen to about $65,000 a year. *See* ECF 148 (Ex. 54 to Abbate Decl.), Aguiniga Dep. Tr. at 39–40.

employees with otherwise unnoteworthy departures from the company. But CHR has pursued relentless litigation against them for five years.

Next, consider what CHR accuses these five former employees of doing, in violation of the provisions in their CBP Agreements. According to CHR it is far less than what the outer limits of the provisions in the agreements could theoretically sustain. *See* ECF 250 at 6 ("While the Agreements contain various severable post-employment obligations, C.H. Robinson seeks to enforce only the Individual Defendants' promises not to divert their C.H. Robinson customers or carriers elsewhere, which obligation is indisputably reasonable under established Minnesota law, as applied to the facts of this case."). But frankly, this claim is more than a bit confusing. For one, while CHR indeed points to evidence that Mr. Antobenedetto, Mr. Buckley, and Mr. Dossey have "diverted" business from CHR, *id*. at 10–14 (discussing the amounts that each individual defendant is alleged to have "diverted" for Traffic Tech), it accuses Mr. Aguiniga of "soliciting," not "diverting," *id*. at 19–20. Although these may be similar concepts in effect, they are discrete terms found in separate provisions in the contracts, and it is not clear whether CHR is now using them interchangeably or has simply overlooked that it is pursuing a different breach theory with Mr. Aguiniga.

More significantly, CHR's claim about the limits of its enforcement efforts is difficult to understand in light of its own statements made elsewhere in briefing over the pending motions. In its opposition to Defendants' current summary judgment motion, CHR asserts that it is not attempting to enforce provision IV(C)(3), the far broader of the two provisions examined above. *See* ECF 255 at 22 (acknowledging that "Section IV(C)(3) . . .

does not include language limiting the obligation to customers the Individual Defendants contacted at C.H. Robinson" and maintaining that "C.H. Robinson is not seeking to enforce this provision. The Court's analysis of Section IV(C)(3) should end here"). But for two reasons, the Court disagrees that the analysis stops here.

First, CHR waited to disavow enforcement of Section IV(C)(3) until the eleventh hour. For much of the past five years of litigation, from the complaints through the first round of summary judgment, CHR sought to enforce both. *See, e.g.*, Sec. Am. Compl. (which does not specify which provisions are being asserted); ECF 1-1 (Orig. Compl.) at, *e.g.*, 17 (quoting all of the CPB Agreements' restrictive provisions found within IV(C)); ECF 167 (Pl.'s Mem. in Opp. to Original S.J.) at, *e.g.*, 14 (citing both IV(C)(1) and IV(C)(3) as being the provisions CHR sought to enforce). It would be unfair to gauge overbreadth on a concession CHR declined to make for years.

Second, their current assertion that they are not seeking to enforce Provision IV(C)(3) is belied by CHR's own simultaneous assertion that they are seeking "to enforce only the Individual Defendants' promises not to divert their C.H. Robinson customers or carriers elsewhere." Indeed, Section IV(C)(3) is the very provision that uses the term "divert," by restricting an employee from "caus[ing] or attempt[ing] to cause" a Business Partner to, among other things, "divert" their business elsewhere. The term divert does not appear in IV(C)(1). So, in seeking to uproot the concept of a prohibition on "divert[ing]" business out of IV(C)(3) and incorporate it into the more limited scope of IV(C)(1), CHR disavows enforcement of IV(C)(3) while continuing to invoke its limitations.

28

This is critical, because "divert," a passive, outcome-focused verb, is doing a lot of the work for CHR at this point. For example, CHR points to evidence that it says shows that Mr. Antobenedetto "diverted as many as 2,224 shipments and billed as much as $2,694,375.60 worth of invoices for Traffic Tech." ECF 250 at 17. And CHR points to similar evidence for Mr. Dossey (alleging he "diverted as many as 247 shipments and billed as much as $831,544.27 worth of invoices for Traffic Tech."), *id*. at 18, as well as for Mr. Buckley (alleging he "diverted 33 shipments and billed $23,640.77 worth of invoices for Traffic Tech."), *id*. at 19. Even if the Court would allow CHR to graft "divert" into Provision IV(C)(1)[17], it is not entirely clear whether the alleged diversions are even attributable to contact that would be restricted under that provision. After all, there is nothing in Provision IV(C)(1) to restrict any of these individual defendants from "diverting" a CHR customer that they never worked with while at CHR. Indeed, as discussed above, attempting to restrict the defendants in that manner would very likely be impermissible.

Admittedly, under Minnesota law, "[e]mployers have a legitimate interest in protecting themselves against 'the deflection of trade or customers by the employee by means of the opportunity which the employment has given him.'" *Fosshage*, 426 N.W.2d at 450 (quoting *Bennett*, 134 N.W.2d at 898). And for each individual defendant, CHR points to at least some evidence tending to show that a customer with whom he worked at CHR then did business with Traffic Tech. *See* ECF 250 at 16–20 (discussing the number

---

[17] As discussed below, the Court declines to "blue pencil" the agreements in this manner.

of their former CHR customers that Mr. Antobenedetto, Mr. Buckley, and Mr. Dossey is alleged to have "diverted to Traffic Tech"). This is combined with some evidentiary anecdotes that substantiate these preexisting relationships. *See, e.g.*, *id*. at 18 (pointing to Mr. Dossey's deposition testimony in which he discussed securing a sale for Traffic Tech with someone that "I'm friends with" and who "I first met [] when I was at C.H. Robinson"). To be sure, this is far from proof of breach of Provision IV(C)(1), which again, does not include the word "divert." If the CPB Agreements were not facially unenforceable, there would be questions of fact about exactly what action CHR believes the individual defendants took that violates IV(C)(1). Indeed, the Court is struck that CHR appears unwilling to state plainly that Mr. Antobenedetto, Mr. Buckley, or Mr. Dossey "solicited" former clients, or for that matter to employ any of the other active verbs found in IV(C)(1). There would also be questions about the nature of the preexisting relationships that the individual defendants allegedly exploited while working for Traffic Tech. *See, e.g.*, *Sysdyne Corp. v. Rousslang*, No. A13-0898, 2014 WL 902713 (Minn. Ct. App. Mar. 10, 2014) (affirming judgment that employer could not reasonably restrict its former employee from engaging with former customers with whom he had a relationship that was not fully attributable to his former employment), *aff'd*, 860 N.W.2d 347 (Minn. 2015).

Ultimately, however, if this kind of "diverting" of former clients is all that CHR truly seeks to protect itself from, then it should have drafted restrictive covenants that were simpler, narrower, and directed toward that end. That is not what it did. Instead, the individual defendants operated under a substantially broader universe of restrictions on their post-employment conduct. And then, when CHR came to believe that they were

engaging in what is arguably limited breaching conduct, CHR nonetheless threw the entire book at them. Wielding the overbroad restrictions in the CPB Agreements as a hammer against workaday ex-employees, before seeking to conveniently narrow them to support their position near the end of the litigation is not context or "attendant circumstance" that saves the covenants from their facial overbreadth. Indeed, this entire course of action only furthers the Court's conclusion that the provisions in this case do far more to discourage legitimate employee mobility than to protect CHR's legitimate protective interests. This exceeds reasonable restriction under Minnesota law, and this Court will not enforce the CPB Agreements against the individual defendants. *See Rao v. St. Jude Med. S.C., Inc.*, No. 19-cv-923 (MJD/BRT), 2020 WL 4060670, at *6 (D. Minn. May 26, 2020) ("In determining whether to enforce a particular noncompete or agreement or provision, the court balances the employer's interest in protection from unfair competition against the employee's right to earn a livelihood.") (Minn. 1998)), *report and recommendation adopted*, No. 19-cv-923 (MJD/BRT), 2020 WL 4059876 (D. Minn. July 20, 2020).

This brings the Court to CHR's final argument of relevance to the overbreadth of the covenants at issue in this case. If the Court finds, as it has, that the covenants are unenforceably overbroad, CHR would like the Court to fix them so that they may be enforced. This request is declined. "Under the blue-pencil doctrine, courts may 'take an overly broad restriction and enforce it only to the extent that it is reasonable.'" *Midwest Sign*, 386 F. Supp. 3d at 1047 (quoting *Klick v. Crosstown State Bank of Ham Lake, Inc.*, 372 N.W.2d 85, 88 (Minn. Ct. App. 1985)). The decision to do so is fully within this Court's discretion. *Id.*; *see Klick*, 372 N.W.2d at 88 ("'[I]n employment cases, a court should be

permitted to make changes.' The logical inference from this statement is that it is at the discretion of the trial court to modify the provisions in equitable situations.") (quoting *Davies & Davies Agency, Inc. v. Davies*, 298 N.W.2d 127, 131 n.1 (Minn. 1980)). "[N]othing in Minnesota state law requires the Court to blue-pencil Plaintiff's non-compete provisions." *Marvin Lumber*, 2015 WL 5719502, at *8.

Here, the "Court would be loathe to go so far to fix *any* contractual provision, much less a restrictive covenant—which, under [Minnesota] law, is disfavored as a restraint on trade[.]" *Moeschler v. Honkamp Krueger Fin. Servs., Inc.*, No. 21-CV-0416 (PJS/DTS), 2021 WL 4273481, at *3 (D. Minn. Sept. 21, 2021) (analyzing a non-solicitation agreement under Iowa law). Fundamentally, doing so would only exacerbate many of the Court's equitable concerns discussed above. To allow CHR the benefit of overly broad restrictions on its employees at the front end, and then revise those restrictions into something more reasonable to capture specific breaching conduct on the backend, is both unfair and anathema to the balancing of interests required under *Bennett*. More specifically, while not quite at the level required to rewrite the "gibberish" that was at issue in *Moeschler*, 2021 WL 4273481, at *4, the blue-penciling here would clearly exceed mere narrowing and would require significant tinkering. As noted previously, the covenants in this case are complex and overlapping, if not confusing and redundant, and any revision to them would necessarily entail significant changes to the whole. It would be inappropriate for this Court to remove the most-applicable conduct out of the most-objectionable provision, place it into the less-objectionable provision, read out any remaining overbreadth from that provision, and then allow CHR to surgically enforce the provision against the defendants.

Again, if CHR would like to protect itself against specific former-employee conduct that it believes is anti-competitive and that it believes has occurred here, it may tailor its future employment agreements in a reasonable manner from the outset and then pursue any meritorious enforcement that it deems necessary.

### 3. Traffic Tech

CHR originally asserted two claims of tortious interference with contracts against Traffic Tech: interference in contracts between CHR and its clients and interference in contracts between CHR and its employees. Judge Davis granted summary judgment and dismissed both of these claims, concluding that CHR had adduced no evidence that Traffic Tech had interfered with customer contracts, *C.H. Robinson*, 2021 WL 4307012 at *11, while reasoning that because the employment contracts were unenforceable under California law, CHR had failed to adduce evidence that Traffic Tech had acted wrongfully by recruiting the individual defendants, *id*. at *12. As noted above, the Eighth Circuit reversed and remanded the latter because it was predicated on the assumption that the contracts were governed by California law, *C.H. Robinson*, 60 F.4th at 1150, but it affirmed the former ruling, *id.* at 1150-51 (noting that "[u]nlike the other two claims, C.H. Robinson's claim for tortious interference with prospective economic advantage is not contingent upon whether the contracts are enforceable" and affirming dismissal).

As to the tortious-interference-with-employment-contracts claim, the Court now reaches the same outcome as Judge Davis. Because the Court has ruled that the individual defendants' CBP Agreements are unenforceable under Minnesota law, those contracts cannot form the basis of a tortious-interference claim. *See Qwest Commc'ns Co., LLC v.*

*Free Conferencing Corp.*, 905 F.3d 1068, 1073 (8th Cir. 2018) (explaining that under Minnesota law, the first element of any tortious interference with contract claim requires the existence of a contract) (quoting *Sysdyne*, 860 N.W.2d at 351). CHR points to no valid contract that Traffic Tech could have interfered with by recruiting and/or hiring the individual defendants. Summary judgment is therefore proper on the remaining tortious interference with contracts claim.

## IV.    Order

For the foregoing reasons, **IT IS HEREBY ORDERED that:**

1.  Defendants' Motion for Summary Judgment (ECF 242) is **GRANTED**;

2.  Plaintiff's Motion to Dismiss (ECF 230) is **DENIED**, and;

3.  Plaintiff's Motion for Summary Judgment (ECF 234) is **DENIED**.

4.  This matter is **DISMISSED**.

**Let Judgment be Entered Accordingly**.

Date: September 27, 2024                          *s/ Katherine M. Menendez*
                                                 Katherine M. Menendez
                                                 United States District Judge